UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SABAL LIMITED LP § | |
| § | |
| Plaintiff, § | |
| § | Case No. 5:16-cv-300 |
| V. § | |
| § | |
| DEUTSCHE BANK AG, § | |
| § | |
| Defendant. § | |
| § | |

## COMPLAINT

Plaintiff Sabal Limited LP ("Sabal"), for its complaint in this matter against Deutsche Bank AG ("DB"), alleges as follows by its undersigned counsel:

### INTRODUCTION

1. For a major multinational banking company, Deutsche Bank has remarkably few scruples about falsifying documents and ignoring the face of its contracts. In this case, DB apparently discovered that the transaction documents it had drafted for the swap transaction it entered into with Sabal did not reflect the transaction structure that DB preferred. So rather than following the transaction the documents reflect, DB instead (a) sent out a purported "revised" confirmation that included a new paragraph not in the version the parties signed (see ¶¶ 16-21, *infra*), and (b) misused its status as Calculation Agent to disregard the actual payment calculation set forth in the parties' agreement as written, and instead calculate the parties' obligations based on what DB wishes the swap documents had said.

2. Sabal was owed substantial periodic payments on which DB has now defaulted. DB's excuse is that, no matter what the swap says, it in reality should have said something different. But DB does not have the unilateral right to amend the parties' agreements. Accordingly, Sabal has

1

terminated the swap and demanded the return of its collateral; and will demand under the swap payment of unpaid amounts in addition to a future amount corresponding to the value of the future payments due to Sabal. In addition, quite apart from DB's default on the swap, it has "locked" almost $1 million of Sabal's deposits at DB over and above any remotely plausible collateral calculation under the swap. That money must be released in all events.

## I. PARTIES, JURISDICTION AND VENUE

3. Sabal is a Texas limited partnership with its principal place of business in San Antonio. Its partners are all citizens of Texas.

4. DB is a German aktiengesellschaft with its principal place of business in Frankfurt, Germany. DB does business regularly in the United States, with offices around the country including at 60 Wall Street in New York.

5. This Court has subject matter jurisdiction pursuant to 28 USC § 1332(a)(2). The amount at issue exclusive of interest and other charges exceeds $75,000.

6. Venue is proper in this district pursuant to 28 USC § 1391(b) and (c).

7. As set forth below, DB did business in Texas by contracting with Sabal in an agreement in which both parties are to perform the contract in whole or in part in Texas, under Tex. Civ. Prac. & Rem. Code § 17.042. In addition, DB's website recites that it maintains offices in Dallas and Houston.

## II. FACTS

8. Sabal is a private investment company that manages a single family's investments. It has been doing business with DB since approximately March 2010.

**A. The Parties Enter Into the Swap**

9. In Spring 2011, DB (through the Houston office of Deutsche Bank Securities, Inc.) proposed to Sabal a method of "cheapening" its capital costs. It offered to Sabal a swap tied to a

2

proprietary DB index called the "DB Pulse USD Index" (the "Index").  The Index tracks the difference between future interest rates as anticipated in the market and the interest rates actually experienced, which historically has generally been lower than anticipated by the market.  DB told Sabal's representative in Texas that a swap based on the Index would make Sabal a lot money.

10.    DB sent a sales presentation to Sabal in Texas, which claimed that a swap tied to the index would "cheapen" Sabal's interest costs by giving Sabal a way to profit from the differential.  Indeed, DB referred to the swap as a "cheapener."

11.    Before entering into the actual swap transaction, DB presented a term sheet to Sabal, which it sent to Sabal in Texas.  The term sheet recited on its face that it is "indicative" (rather than binding), and expressly says it is provided for discussion purposes only and is not even an offer to transact.  The term sheet described the formula for calculating the floating payments under the swap only as based on the Index's "performance" without specifying what "performance" means.

11.    The actual swap transaction was entered into as of July 15, 2011 (the "Swap").  Like most swap transactions, the agreement is memorialized in a cluster of related documents:  (a) the ISDA Master Agreement dated as of July 15, 2011; (b) a Schedule to the ISDA Master Agreement; (c) a Credit Support Annex ("CSA") to the Schedule; and (d) a Confirmation (together the "Swap Documents").  Although these are standard forms, each of them contains customizable provisions that must be crafted for each counterparty and each swap transaction individually.  In this case, every one of these customized documents was drafted by DB and presented "as is" to Sabal.

12.    The parties executed the Swap Documents effective as of July 15, 2011.  DB sent each of the documents to Sabal to sign in Texas.  Sabal signed them in Texas.  The Swap Documents are governed by New York law.

13.    Under the Swap Documents (specifically the Confirmation), DB as the "Fixed Rate Payer" is required to make a fixed payment quarterly to Sabal, equal to 4.65% of the notional

3

amount of $16 million, until the scheduled termination of the Swap in August 2021. For the first fifteen quarters of the Swap until August 2015, Sabal as the "Fixed Rate Payer II" was obligated to make counterpart fixed payments quarterly to DB, equal to 2.25% of the notional amount of $16 million. Thereafter, commencing November 2015 and continuing until the scheduled termination of the swap in 2021, Sabal as "Floating Rate Payer" was obligated to make counterpart floating payments calculated pursuant to a formula, under which the Floating Rate was determined based on the Index. DB is the Calculation Agent under the Swap Documents, with the obligation to calculate the Floating Rate accurately.

14. Following the execution of the documents, DB sent periodic account statements to Sabal in Texas with respect to the status of the swap transaction. It also sent notices to Sabal in Texas. Sabal dealt with DB on an ongoing and regular basis through the DB office in Houston which, on information and belief, acted on behalf of or in coordination with DB's New York and Frankfurt offices.

**B.     Collateral provisions; DB's falsification of documents**

15. At the inception of the Swap transaction, Sabal posted collateral in an amount specified by Deutsche Bank. The total collateral posted was, as of today, $4,463,955.79.

16. The collateral DB initially took consisted of two pieces, both of which were calculated by Deutsche Bank: (a) an "Independent Amount" of $960,000 and (b) a Credit Support Amount purportedly sufficient to secure the "Exposure" as defined in the CSA, calculated by DB.

17. DB took the collateral by placing a "lock" on Sabal's account at the Houston office of Deutsche Bank Securities, Inc. The total amount currently "locked" is almost $4.5 million.

18. In reality, the CSA does not provide for Sabal to provide any "Independent Amount." Neither the Confirmation nor any other document specifies an Independent Amount to be provided by Sabal.

4

19. In January 2016 – after this dispute arose, and long after the Swap Documents were executed -- DB realized that the Swap Documents it had drafted omit any requirement for an Independent Amount (even though DB had "locked" that amount from the inception of the Swap). DB created a purported "revised" Confirmation, which altered a single page of the existing Confirmation and inserted it into the existing signed Confirmation. DB sent the falsified document to Sabal's counsel on January 29, 2016.

20. The altered page is page 5, at the end of paragraph 5, which is labelled "Definitions." The original page 5 of the executed Confirmation did not contain a provision titled "Credit Provisions." The last sub-paragraph in paragraph 5 of the executed Confirmation was titled "Successor Index." The altered page 5 contains an additional subparagraph below "Successor Index," titled "Credit Provisions." DB apparently inserted this paragraph after the fact -- after the Confirmation was signed by both parties -- in an effort to change the terms of the Confirmation while not affecting the signature page, which is page 6.

21. After Sabal realized that DB had improperly "locked" almost a million dollars in collateral that the Swap Documents did not require, Sabal demanded on March 7, 2016 that DB unlock the money. DB refused and continues to refuse.

**C.**     **Performance under the Swap; the dispute ripens**

22. Under the Swap Documents, as noted, DB made quarterly payments to Sabal. The initial payment was made on November 2, 2011.

23. Until August, 2015, DB never made demand on Sabal for a payment. Until that time, DB's fixed payment obligation exceeded Sabal's fixed payment obligation. By notice dated July 30, 2015, DB notified Sabal that Sabal was obliged to pay to DB $152,288.89 on November 2, 2015 as a result of applying the Floating Rate calculation formula.

24. The formula in the Confirmation, however, does not require any such payment. The "Floating Rate" is defined in the Swap as "2.25% + 5 * [Strike – (Index $_{\text{End of Period}}$/Index $_{\text{Initial}}$)], subject to a floor of 0.00% and a cap of 8.50%." The Strike, in turn, is defined as "3.20% from and including 1 November 2015, increasing 0.20% every quarter thereafter."

25. Under the formula as written, the Floating Rate would often fall below the floor (which, of course, is the very the purpose of a floor). Thus, for example, if the Index increased 3%, then the formula would yield .0225 + 5 * [.032 – 1.03] = .0225 + 5 * -.998 = .0225 – 4.99 = -4.9675. Expressed in percentages, the formula would be 2.25% + 5 * [3.2% - 103%] = 2.25% + 5* [-99.8%] = 2.25% - 499% = -496.75%. This negative number is below the 0% floor.

26. Even though the formula is clear on its face, DB starting in late 2015 calculated the formula as if it contained a "minus 1" after the ratio of the ending Index to the initial Index. In other words, although the formula in the Confirmation does not contain the "minus 1," DB calculated the Floating Rate as if the formula actually read "2.25% + 5 * [Strike – (Index $_{\text{End of Period}}$/Index $_{\text{Initial}}$ **-1**)], subject to a floor of 0.00% and a Cap of 8.50%." The -1 results in a much smaller deduction from the Strike of 3.2% and, since the result is multiplied by 5, and then added to 2.25%, will tend to result in an outcome far above the floor and often in excess of the Cap. Of course, the Confirmation makes no mention of a minus 1 deduction from the ratio of current Index to initial Index. By unilaterally inserting the minus 1, DB violated its obligations as Calculation Agent under the Swap Documents to calculate accurately the Floating Rate as set forth in the Confirmation.

27. Sabal received from DB a notice bearing a date of July 30, 2015, which claimed that as of November 2, 2015, a payment would be due in the amount of $152,288.89. The notice recited that the 8.5% cap was the controlling floating rate (*i.e.*, the formula yielded a percentage that was higher than the 8.5% cap). The claimed 8.5% Floating Rate Payment supposedly due from Sabal to

DB exceeded the 4.65% Fixed Rate Payment due to Sabal from DB, with the net result that DB was demanding from Sabal a 3.85% payment.

28. After inquiries, including inquiries with DB, Sabal learned that DB was calculating the Floating Payment as if it contained "minus 1" after the ratio of current index to initial index. The effect of this unilateral amendment by DB of the terms of the Confirmation was dramatic. Instead of consistently being below the 0% floor, which resulted in Sabal owing no net Floating Payment, the Floating Rate instead exceeded the 8.5% cap (and thus was 8.5%), which resulted in Sabal's Floating Payment exceeding the countervailing Fixed Payment by 3.85%.

29. DB sent a potential default notice, dated December 22, 2015, to Sabal based on Sabal's refusal to meet DB's unwarranted demands.

30. Sabal thereafter agreed to make a "without prejudice" payment in the amount DB request, as a goodwill gesture and in the hopes of facilitating an amicable resolution of the problem, perhaps by amending the swap. Sabal reserved as well its rights with respect to DB's obligation to make a Fixed Payment to Sabal.

31. No such amicable resolution was forthcoming. DB sent another notice, purporting to require a payment, based again on the Floating Rate exceeding the 8.5% Cap, due by February 1, 2016. Sabal's position was that DB continued to owe a Fixed Rate Payment to Sabal that was not more than offset by a counterpart Floating Rate payment from Sabal, and that DB had failed to comply with that obligation.

32. After discussions among the parties and counsel, the parties agreed to postpone the Payment Dates with respect to their respective obligations, first to February 22, 2016 and then to March 14, 2016.

7

33.     On March 7, 2016, Sabal by its counsel demanded release by March 10, 2016 of the $960,000 "Independent Amount" that DB, without any basis in the Swap Documents, had locked. Sabal also demanded the release of the remaining collateral and return of the good-faith payment.

34.     In subsequent discussions between counsel, the parties agreed to extend the Payment Dates until March 17, 2016.

35.     Sabal received no payment from DB on March 17, and so it delivered to DB a notice of potential default on March 18 at approximately 9:30 a.m. Eastern Time.  A copy of the notice was sent to DB's counsel at about 9:45 a.m. Eastern Time.

36.     DB then countered by purporting to serve a notice of potential default upon Sabal, which it delivered to two addresses in San Antonio late in the afternoon that same day.  One was delivered to one of Sabal's principals at about 4:15 p.m. Eastern Time, and the other was taped to the door of the home of another of Sabal's principals, not in an envelope, in the same manner as an eviction notice.

37.     Sabal on March 24, 2016 delivered to DB's main office in Frankfurt, Germany, a notice of termination based on DB's default.  DB has delivered a purported counterpart notice to Sabal the same day.

**First Claim for Relief**
(Declaratory Judgment)

38.     Sabal incorporates by reference the allegations of the foregoing paragraphs.

39.     A dispute exists between Sabal and DB with respect to their respective obligations and rights under the Swap Documents.

40.     The Court should declare the parties' respective rights and obligations under the Swap Agreements, by declaring that DB has no right to retain the Independent Amount of $960,000; by declaring that DB must calculate the Floating Rate solely in accord with the express face of the Confirmation that DB drafted; by declaring that DB continues to be obligated to make

8

Fixed Payments to Sabal; by declaring that DB's attempt to terminate the Swap based on alleged breaches by Sabal was wrongful and nugatory; and/or by declaring that DB has defaulted and that Sabal rightly terminated the Swap and is entitled to the remedies for default set forth in the Master Agreement, including return of its collateral.

41. Sabal has no adequate remedy at law.

## Second Claim for Relief
(Conversion)

42. Sabal incorporates by reference the allegations of the foregoing paragraphs.

43. At the inception of the Swap, DB calculated the amount of collateral Sabal was required to provide, and advised Sabal of the amount. That amount included an "Independent Amount" of $960,000 that is not required by the Swap Documents.

44. DB has in essence conceded that the Swap Documents do not call for Sabal to provide an Independent Amount because it attempted to falsify the Confirmation to change its terms.

45. Sabal has demanded release of the $960,000. DB has refused to release it.

46. DB is liable to Sabal for conversion. And because DB acted outrageously in (a) refusing to release monies for which there is no basis for DB to keep, and (b) going so far as to as to falsify documents to justify keeping the money, DB should be assessed punitive damages as well.

## Third Claim for Relief
(Breach of Contract)

47. Sabal incorporates by reference the allegations of the foregoing paragraphs.

48. DB is in default under the Swap. Sabal has accordingly terminated the Swap. Sabal is entitled to all remedies provided in connection with early termination under the Swap Documents.

## Fourth Claim for Relief
(Breach of Contract)

49. Sabal incorporates by reference the allegations of the foregoing paragraphs.

9

50. DB has breached its obligations as Calculation Agent by purporting to calculate the Floating Rate using a formula other than the one set forth in the parties' agreement.

51. DB has breached its obligations under the Swap by failing to make Fixed Payments to Sabal on at least two occasions so far.

52. Sabal is entitled to damages for DB's breaches of contract.

WHEREFORE, Sabal respectfully requests that judgement be entered in its favor, granting Sabal relief as follows:

A. On the First Claim for relief, a declaration that: DB has no right to retain the Independent Amount of $960,000; DB must calculate the Floating Rate solely in accord with the express face of the Confirmation that DB drafted; DB continues to be obligated to make Fixed Payments to Sabal; DB's attempt to terminate the Swap based on alleged breaches by Sabal was wrongful and nugatory; and/or DB has defaulted and that Sabal rightly terminated the Swap and is entitled to the remedies for default set forth in the Master Agreement, including return of its collateral.;

B. On the Second Claim for Relief, compensatory damages in an amount to be determined at trial, together with exemplary and punitive damages;

C. On the Third Claim for Relief, damages as set forth in the Swap Documents;

D. On the Fourth Claim for Relief, damages in an amount to be determined at trial;

E. Interest, costs and attorney's fees as provided in the Swap Documents or as otherwise permitted by law; and

F. Such other and further relief as may seem to the Court just and proper.

Dated:  San Antonio, Texas.

Dated:  March 24, 2016

Respectfully submitted,

STRASBURGER & PRICE, LLP
2301 Broadway
San Antonio, Texas 78215
Telephone – 210-250-6019
Facsimile – 210-258-2720


By /s/ John Alex Huddleston
    JOHN ALEX HUDDLESTON
    State Bar Number 10148400
    Alex.huddleston@strasburger.com
    FORREST M. "TEO" SEGER III
    State Bar Number 24070587
    Teo.seger@strasburger.com

ATTORNEY IN CHARGE FOR PLAINTIFF
SABAL LIMITED LP

Stuart M. Riback (New York Bar #2002319)
*Admission Pro Hac Vice Forthcoming*
WILK AUSLANDER
1515 Broadway, 43rd Floor
New York, NY  10036
Telephone:     (212) 981-2300
Facsimile:      (212) 752-6380
Email:    sriback@wilkauslander.com

ATTORNEYS FOR PLAINTIFF

11