IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SABAL LIMITED LP, | § | No. 5:16–CV–300–DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| DEUTSCHE BANK AG, | § | |
| | § | |
| Defendant. | § | |

ORDER GRANTING MOTION TO TRANSFER VENUE

Before the Court is a Motion to Transfer Venue or Dismiss the Amended Complaint filed by Defendant Deutsche Bank AG ("Defendant" or "Deutsche Bank").  (Dkt. # 9.)  On September 15, 2016, the Court held a hearing on the motion: Stuart M. Riback of Wilk Auslander LLP and John A. Huddleston of Strasburger & Price, LLP appeared on behalf of Sabal Limited LP ("Plaintiff" or "Sabal"); David L. Goldberg of Katten Muchin Rosenman LLP appeared on behalf of Deutsche Bank.  After careful consideration of the memoranda filed in support of and in opposition to the motion, as well as the arguments made at the hearing, the Court, for the reasons that follow, **GRANTS** the Motion to Transfer (Dkt. # 9).

BACKGROUND

Sabal is a Texas limited partnership and private investment company based out of San Antonio, Texas, that manages a single family's investments.

("Am. Compl.," Dkt. # 3 ¶¶ 3, 8.)  Deutsche Bank is a German Aktiengesellschaft[1]

with its principal place of business in Frankfurt, Germany.  (Id. ¶ 4.)

I.     The Securities Account Agreement

On February 23, 2010, Sabal, Deutsche Bank Securities Inc.[2]

("DBSI"), and Deutsche Bank—through its New York affiliate Deutsche Bank

Trust Company of Americas—entered into a Securities Account and Control

Agreement ("SACA").  ("SACA," Dkt. # 13-10, Ex. 9.)  Through the SACA, Sabal

established two accounts at DBSI: a primary account "used for trading and margin

activities," and a secondary account "used solely to hold financial assets as

collateral" in favor of Deutsche Bank (collectively, "the Securities Accounts").

(Id. § 2.2.1.)  The SACA required DBSI to honor all instructions from Sabal with

respect to financial assets held in the primary account.  (Id. ¶ 2.4.1.)  However, the

SACA prohibited DBSI from honoring Sabal's requests to trade, redeem, or

transfer financial assets in the secondary account, and granted Deutsche Bank a

first lien on the secondary account.  (Id. §§ 2.2.2, 2.4.2.)

---

[1] Aktiengesellschaft translated to English refers to a German public limited company whose shares are offered to the general public and traded on a public stock exchange.

[2] DBSI is a Deutsche Bank affiliate and a broker-dealer that executes securities transactions for Deutsche Bank and its clients.  (Dkt. # 9 at 2.)

The SACA and Sabal's Securities Accounts "shall be governed by, and construed in accordance with, the laws of the State of New York."  (Id. § 4.1.) The SACA also contains a forum-selection clause stating:

> In any action or proceeding arising out of or relating to this Agreement, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and the federal courts in New York City . . . [Sabal] hereby irrevocably waives any objection [it] may now or hereafter have to the laying of venue in the aforesaid courts, and any claim that any of the aforesaid courts is an inconvenient forum . . . [Sabal] further agrees that any action or proceeding by Sabal against [Deutsche Bank] in any respect to any matter arising out of, or in any way relating to, this Agreement or the obligations of [Sabal] hereunder shall be brought only in the State and County of New York.

(Id. § 4.2.)  Section Five of the SACA pertains to "Conflict with Other Agreements" and states in relevant part:

> In the event of any conflict between this Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, the terms of this Agreement shall prevail.

(Id. § 5.1.)

II.     The Swap Agreement

On July 15, 2011, Deutsche Bank and Sabal entered into a swap agreement.  ("Confirmation," Dkt. # 13-9, Ex. 8.)  Under the terms of the swap, Deutsche Bank would pay Sabal a fixed rate of 4.65% on a notional $16 million every quarter from November 1, 2011, through August 1, 2021.  (Id. at 2.)  In exchange, Sabal would make payments to Deutsche Bank in two separate tranches.

First, from August 1, 2011, through November 1, 2015,[3] Sabal would pay Deutsche Bank a fixed rate of 2.25% on a notional $16 million every quarter.  (Id.) Second, starting November 1, 2015, through August 1, 2021, Sabal would pay Deutsche Bank a floating rate on a notional $16 million every quarter.  (Id.)  The floating rate was determined using a calculation tied to the price of Deutsche Bank's PULSE USD Index, but subject to a 0.00% floor and an 8.50% ceiling.[4] (Id. at 2−4.)  Deutsche Bank was contractually assigned the duty as "Calculation Agent," who was responsible for calculating the floating rate each quarter.  (Id. at 2, 4.)

Sabal and Deutsche Bank memorialized the swap agreement using four separate, industry standard, and integrated instruments.  The four instruments are: (1) the International Swap Dealers Association ("ISDA") Master Agreement ("Master Swap Agreement"); (2) the Schedule to the ISDA Master Swap Agreement ("Swap Schedule"); (3) the Credit Support Annex to the Swap Schedule ("CSA"); and (4) the trade confirmation ("Confirmation") (collectively "Swap Documents").  ("Master Swap Agreement," Dkt. # 13-6, Ex. 5; "Swap Schedule," Dkt. # 13-7, Ex. 6; "CSA," Dkt. # 13-8, Ex. 7; Confirmation.)  The

---

[3] Sabal's payments commenced November 1, 2011, but included the August 1, 2011 payment.  (Confirmation at 2.)

[4] The Floating Rate equals: $2.25\% + 5 * [Strike - \left(\frac{Index_{End\ of\ period}}{Index_{Initial}}\right)]$, where "Strike" means 3.20% from and including November 1, 2015, increasing 0.20% every quarter thereafter.  (Confirmation at 2−3.)

Swap Documents expressly provide that they "shall be governed by, and construed and enforced in accordance with, the laws of the State of New York." (Master Swap Agreement § 13(a); Swap Schedule Part 4(h).) The Master Swap Agreement also contains a forum-selection clause stating in relevant part:

> With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits . . . to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York.

(Master Swap Agreement § 13(b)(i).) Further, the Master Swap Agreement provides that "[n]othing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction." (Id. § 13(b).) Finally, the Master Swap Agreement contains a merger clause stating that it "constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." (Id. § 9(a).)

### III.   The Dispute

The present dispute arises out of two discrete actions allegedly taken by Deutsche Bank. First, Sabal alleges that at the inception of the swap, Deutsche Bank took an "Independent Amount" of $960,000 as collateral from Sabal's accounts held at DBSI. (Am. Compl. ¶¶ 16−17.) The CSA expressly provides that the primary and secondary accounts—the accounts established by the SACA—are used to hold eligible collateral for the swap. (CSA § 13(g)(i); id. Ex. A.)

5

However, Sabal contends that the Swap Documents do not provide Deutsche Bank authorization to take the "Independent Amount." (Am. Compl. ¶ 19.) Further, Sabal alleges that Deutsche Bank wrongfully took more collateral by locking Sabal's primary or secondary accounts at DBSI, preventing Sabal from accessing almost $4.5 million. (Id. ¶ 18.) Finally, Sabal alleges that Deutsche Bank fraudulently altered language in the original Confirmation after the parties executed the Swap Documents to give it authority to take an "Independent Amount" as collateral.

The second dispute arose when it came time for Sabal to make payments to Deutsche Bank using the floating rate formula. (Id. ¶¶ 24−29.) Specifically, the dispute concerns the calculation of the floating rate, and the amount of money Sabal owed Deutsche Bank starting November 2015. On July 30, 2015, Deutsche Bank notified Sabal that Sabal was obligated to make a payment in the amount of $152,288.89 on November 2, 2015, as a result of the floating rate calculation formula. (Id. ¶ 24.) However, Sabal contends that Deutsche Bank calculated the floating rate without using the contractually agreed formula. (Id. ¶ 24−25.) Instead, Sabal alleges that Deutsche Bank inserted a "minus 1" into the floating rate equation, resulting in a rate exceeding the ceiling

and thus requiring Sabal to pay 8.5% per quarter on the notional $16 million.[5]  (Id.
¶¶ 23−29.)  Sabal argues that the floating rate formula as written in the Swap
Documents results in a floating rate below the floor, thus resulting in a floating rate
of 0%.  (Am. Compl. ¶ 26.)  Since the applied floating rate of 8.5% exceeded the
4.65% rate Deutsche Bank was obligated to pay Sabal, the net effect of the swap
required Sabal to pay Deutsche Bank 3.85% on the notional $16 million every
quarter.  Sabal's position is that because the proper calculation of the floating rate
results in a rate of 0%, Deutsche Bank should pay Sabal 4.65% every quarter.  (Id.
¶¶ 28−29, 32.)

On December 22, 2015, Deutsche Bank sent Sabal a potential default
notice because Sabal refused to make payment on November 2, 2015.  (Am.
Compl. ¶ 30.)  To avoid default, Sabal made a good faith payment to Deutsche
Bank in the requested amount of $152,288.89.  (Id.)  Subsequently, Deutsche Bank
sent another notice to Sabal indicating that the floating rate was 8.5% and a
payment was due on February 1, 2016. (Id. ¶ 32.)

On March 7, 2016, Sabal demanded that Deutsche Bank return the
good faith payment, release the "Independent Amount" collateral worth $960,000,
and unlock the remaining collateral in Sabal's secondary account located at DBSI.
(Id. ¶ 34.)  Deutsche Bank did not comply with Sabal's demand, so Sabal sent to

---

[5] Sabal alleges that Deutsche Bank confirmed that it had calculated the floating rate
using a "minus 1."  (Am. Compl. ¶ 31.)

Deutsche Bank a notice of potential default on March 18, 2016.  (Id. ¶ 36.)

Deutsche Bank countered by serving notices of potential default on Sabal in San

Antonio, Texas.  (Id. ¶ 37.)  On March 24, 2016, Sabal terminated the Master Swap

Agreement by delivering notice on Deutsche Bank in Frankfurt, Germany.  (Am.

Compl. ¶ 38.)  Deutsche Bank sent a termination notice and a calculation notice to

Sabal the same day.  (Id. ¶¶ 38−39.)

On March 24, 2016, Sabal filed suit in this Court.  (Dkt. # 1.)  On

March 30, 2016, Sabal filed an Amended Complaint.  (Am. Compl.)  Sabal seeks

declaratory judgment, asserts a cause of action for conversion, and two causes of

action for breach of contract.  (Id. ¶¶ 40−54.)

On May 5, 2016, Deutsche Bank and DBSI sued Sabal in the United

States District Court for the Southern District of New York ("the NY Action") for

conduct arising out of the same facts of this case.  (Dkt. # 13-5, Ex. 4.)  In the NY

Action Complaint, Deutsche Bank admits that it has calculated the floating rate

using a "minus 1," but contends that its omission in the original Swap Documents

was a scrivener's error. (Id. ¶ 4.)  Deutsche Bank and DBSI seek declaratory

judgment to reform the Swap Documents due to the scrivener's error, and to order

DBSI to transfer certain collateral obligations to Deutsche Bank.  (Id. ¶¶ 49−64.)

Deutsche Bank also asserts causes of action against Sabal for breach of contract

and unjust enrichment.  (Id. ¶¶ 65−76.)

On June 20, 2016, Deutsche Bank filed a Motion to Transfer Venue or Dismiss the Amended Complaint for lack of Personal Jurisdiction and Improper Venue.   (Dkt. # 9.)   Sabal filed a Response (Dkt. # 13) and Deutsche Bank filed a Reply (Dkt. # 15.)

<u>LEGAL STANDARD</u>

I.    <u>Venue Transfers Based on Forum Selection Clauses</u>

The Supreme Court held that a party may not enforce a forum-selection clause by seeking dismissal of the suit under 28 U.S.C. § 1406(a) and Rule 12(b)(3) because those provisions only apply when venue is "wrong" or "improper," as determined by federal venue law, 28 U.S.C. § 1391.  <u>Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for the Western District of Texas</u>, 134 S. Ct. 568, 577–79 (2013).  Rather, a forum-selection clause may be enforced through a motion to transfer under 28 U.S.C. § 1404(a), which "permits transfer to any district where venue is also proper (i.e., 'where [the] case] might have been bought') or to any other district to which the parties have agreed by contract or stipulation."  <u>Id.</u> at 579 (quoting 28 U.S.C. § 1404(a)).  "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause" and a proper application of § 1404(a) requires that a forum-selection clause be "given controlling weight in all but the most exceptional cases."  <u>Id.</u> at 581.

9

In the typical § 1404(a) analysis, the district court weighs the relevant public and private factors and decides whether, on balance, a transfer would serve "the convenience of parties and witnesses" and otherwise promote "the interest of justice." Id. at 581 n.6; see also In re Volkswagon, AG, 371 F.3d 201, 203 (5th Cir. 2004). The private factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. In re Volkswagon, AG, 371 F.3d at 203. The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or applying the foreign law. Id. A court also gives some weight to the plaintiff's choice of forum. Atl. Marine Const. Co., 134 S. Ct. at 581 n.6.

However, the usual § 1404(a) calculus changes when the transfer motion is premised on a forum-selection clause. Id. This is primarily because "a forum-selection clause . . . may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms . . . ." Id. at 583. In fact, it may "have been a critical factor in their agreement to do business together in the first place." Id. As such, "when parties have contracted in

10

advance to litigate disputes in a particular forum," district courts should adjust their

usual § 1404(a) analysis in three ways to "not unnecessarily disrupt the parties'

settled expectations." Id. at 582–83.

First, where a forum selection clause applies, the plaintiff's choice of

forum merits no weight.  Although the plaintiff is ordinarily allowed to select

whatever forum it considers most advantageous, "when a plaintiff agrees by

contract to bring suit only in a specified forum, the plaintiff has effectively

exercised its 'venue privilege' before the suit arises." Id. at 581–82.  As such, only

the plaintiff's initial choice—that is, the agreed-to choice memorialized in the

contract's forum-selection clause—deserves deference.  Id. at 582.  The plaintiff

bears the burden of establishing that transfer to the forum for which the parties

bargained is unwarranted.  Atlantic Marine, 134 S. Ct. at 582.

Second, a court should not consider arguments about the parties'

private interests because when parties agree to a forum-selection clause, they have

effectively waived their right to challenge the preselected forum.  Id.  "[A] court

must deem the private-interest factors to weigh entirely in favor of the preselected

forum" because "'whatever inconvenience [the parties] would suffer by being

forced to litigate in the contractual forum as [they] agreed to do was clearly

foreseeable at the time of contracting.'"  Id. (quoting M/S Bremen v. Zapata Off-

Shore Co., 407 U.S. 1, 17–18 (1972)).  Instead, a court may only consider

11

arguments about public-interest factors.  Id.  "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases."  Id.

Third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations."  Id.  Rather, the court in the contractually selected venue should not apply the law of the transferor venue; instead, it should apply its own law.  Atlantic Marine, 134 S. Ct. at 583.

In sum, Atlantic Marine held that if a contractually valid forum-selection clause exists and applies to the lawsuit, a court should grant the motion to transfer in accordance with the forum-selection clause absent extraordinary circumstances.  Id. at 581.  The party opposing the transfer bears a heavy burden of establishing that the transfer is unwarranted due to the extraordinary circumstances as "[i]n all but the most unusual cases," no extraordinary circumstances will exist that warrant refusal to transfer in accordance with a forum-selection clause.  Id. at 582–83.

When determining whether extraordinary circumstances exist that warrant denial of transfer, only the public-interest factors of a traditional § 1404(a) analysis may be considered, including: (1) the administrative difficulties flowing

12

from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.  Id. at 581–82.

DISCUSSION

This case calls upon the Court to first determine which forum selection clause applies, and depending on that determination, whether to transfer venue.

I.      The Forum Selection Clauses

A court must first determine whether a forum selection clause is mandatory or permissive.  Weber v. PACT XPP Tech., AG, 811 F.3d 758, 770−71 (5th Cir. 2016) (citing Phillips v. Audio Active Ltd., 494 F.3d 378, 384−86 (2d Cir. 2007)).  Once a court makes this determination, it must then decide whether a forum-selection clause applies to the present case, which involves two separate inquiries: (1) whether the contract is valid and the forum-selection clause is enforceable, and (2) whether the present case falls within the scope of the forum-selection clause.  Id. at 770 ("Only after the court has interpreted the contract to determine whether it is mandatory or permissive does its enforceability come into play."); Mendoza v. Microsoft, Inc., 1 F. Supp. 3d 533, 542 (W.D. Tex. 2014) (citing Braspetro Oil Servs. Co. v. Modec (USA), Inc., 240 F. App'x 612, 616 (5th

Cir. 2007) (enforcing a forum-selection clause requires first assessing the clauses's

contractual validity and its scope)).

      A. <u>Choice of Law</u>

        As a threshold matter, the Court must determine what substantive law

to apply to various parts of the analysis below.  The Fifth Circuit holds that federal

law applies to determine the enforceability of forum-selection clauses in both

diversity and federal question cases.[6]  <u>Barnett v. DynCorp Int'l, L.L.C.</u>, ---F.3d---,

2016 WL 4010440, at *3 (5th Cir. 2016) (citing <u>Haynsworth v. The Corp.</u>, 121

F.3d 956, 962 (5th Cir. 1997)); <u>see also</u> <u>Ginter ex rel. Ballard v. Belcher,

Prendergast & Laporte</u>, 536 F.3d 439, 441 (5th Cir. 2008).  However, to interpret

the meaning and scope of a forum selection clause, a court must use the forum's

choice-of-law rules to determine what substantive law governs.  <u>Weber</u>, 811 F.3d

758, 770−71; <u>Barnett</u>, 2016 WL 4010440 at *3; <u>Phillips</u>, 494 F.3d at 385.

Accordingly, Texas choice-of-law rules apply.

        Here, both the SACA and the Swap Documents expressly provide that

they should be interpreted and construed using New York Law.  (SACA § 4.1;

Master Swap Agreement § 13(a); Swap Schedule Part 4(h).)  "Texas law gives

effect to choice of law clauses regarding construction of a contract."  <u>Benchmark</u>

---

[6] Neither party has raised a challenge to the enforceability of the relevant forum
selection clauses.

Electronics, Inc. v. J.M. Huber Corp., 343 F.3d 719, 726 (5th Cir. 2003) (citing In re J.D. Edwards World Solutions Co., 87 S.W.3d 546, 549 (Tex. 2002)).

Therefore, the Court will apply New York law to address Sabal's arguments based on contract law, and to interpret the scope of the forum selection clauses. See Stinger v. Chase Bank, USA, NA, 265 F. App'x 224, 227 (5th Cir. 2008) (explaining that to determine whether a dispute falls within the scope of an arbitration agreement courts should apply state law (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)); Brown v. Federated Capital Corp., 991 F. Supp. 2d 857, 860−61 (S.D. Tex. 2014) (applying state substantive law to determine the scope of a forum selection clause).

It is important to also note that cases analyzing forum selection clauses are wrought with ambiguous legal reasoning.  The vast majority of federal courts have not clearly articulated the applicable law used to interpret the meaning and scope of forum selection clauses.  Instead, to the detriment of sound legal analysis, the vast majority of federal district and circuit courts have simply cited to federal precedent when interpreting forum selection clauses without conducting a choice-of-law analysis to identify the source of the substantive law.  See e.g., Mendoza, 1 F. Supp. 3d at 547–48 (citing federal precedent and general common-law contract principles to determine the scope of a forum selection clause); Phillips, 494 F.3d at 385 ("[W]e have turned to federal precedent to interpret forum

clauses, but the underlying choice of law question has been left unaddressed.").

Indeed, the Fifth Circuit has taken notice of this undisciplined practice by

observing that "[n]either this nor our sister circuits appear to have hewn closely to

this principle [of conducting a choice-of-law analysis] in interpreting [forum

selection clauses]." Weber, 811 F.3d at 771.  Instead, "[t]he courts have

interpreted [forum selection clauses] according to general common-law contract

principles without addressing the source of that law." Id.  In an attempt to explain

this analytical confusion, the Fifth Circuit notes that "[t]he general-law approach

may be because, in this circuit and others, the *enforceability* of a [forum selection

clause] is governed by federal law." Id. at 770.  In that same vein, the Second

Circuit wrote in dicta that "we cannot understand why the interpretation of a forum

selection clause should be singled out for application of any law other than that

chosen to govern the interpretation of the contract as a whole." Phillips, 494 F.3d

at 386.  The Second Circuit's reasoning also comports with Tenth Circuit law

where "[a] forum selection clause is part of the contract" and should not be

"singled out as a provision not to be interpreted in accordance with the law chosen

by the contracting parties." Yavuz v. 61 MM, Ltd., 465 F.3d 418, 428 (10th Cir.

2006).

      Here, the Court declines to continue the trend of inelegant and

confusing analysis by simply citing federal precedent and general common law

contract principles to interpret the meaning and scope of the forum selection clauses at issue.  Indeed, following that trend is wrong because "there is no federal common law of contracts."  Barnett, 2016 WL 4010440 at 3 (quoting Ford v. Hamilton Invs., Inc., 29 F.3d 255, 258 (6th Cir. 1994)).  Instead, the Court will adhere to guidance from the Fifth Circuit that its "core obligation" is "to ascertain which body of substantive law to apply by implementing the choice-of-law rules of its home jurisdiction."  Weber, 811 F.3d at 771.  In this case, there is no doubt, for the reasons explained above, that Texas's choice-of-law rules dictate that New York substantive law applies to interpret the meaning and scope of the contracts and forum selection clauses in this case.

> ### B. Mandatory and Permissive Nature of the Forum Selection Clauses

"The general rule in cases containing forum selection clauses is that '[w]hen only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive."  Fear & Fear, Inc. v. N.I.I. Brokerage, L.L.C., 851 N.Y.S.2d 311, 313 (N.Y. App. Div. 2008).  A permissive forum selection clause "contains no mandatory language binding the parties to a particular forum [but] merely states that the [party] will submit to the jurisdiction to be selected by [the other party]."  Columbia Cas. Co. v. Bristol-Myers Squibb Co., 635 N.Y.S.2d 173, 176 (N.Y. App. Div. 1995).

The Court has no difficulty in concluding that the SACA's forum selection clause is mandatory, and the forum selection clause in the Master Swap Agreement is permissive.  The SACA's forum selection clause states "the parties hereto hereby <u>irrevocably submit to the exclusive jurisdiction</u> of the courts of the States of New York and the federal courts in New York City."  (SACA § 4.2.) (emphasis added).  This clause is unambiguously mandatory.  The presence of the words "irrevocably submit" and "exclusive" demonstrates the parties' intent to bind themselves to the particular forum of New York state courts or federal courts in New York City.  <u>See</u> <u>Fear & Fear</u>, 851 N.Y.S. at 313.  Further, no conditional or permissive language is present in the clause to suggest otherwise.  <u>See id.</u>  On the other hand, the forum selection clause in the Master Swap Agreement states "each party <u>irrevocably submits . . . to the non-exclusive jurisdiction</u> of the courts of the State of New York and the United States District located in the Borough of Manhattan in New York City [but] [n]othing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction."  (Master Swap Agreement § 13(b)) (emphasis added).  This clause is unambiguously permissive. The submission to "non-exclusive" jurisdiction and the language permitting proceedings in "any other jurisdiction" clearly demonstrates that the parties intended to only consent to jurisdiction in the New York venues, but not be required to bring lawsuits in those venues.

18

Having determined the nature of each relevant forum selection clause, the Court must address the enforceability and applicability of the forum selection clauses.

C. Enforceability of the Forum Selection Clauses

Typically, parties litigate the enforceability of a forum selection clause on grounds that it is unreasonable.[7] Haynesworth, 121 F.3d at 963. However, in this case, Sabal does not challenge the enforceability of SACA's forum selection clause on traditional unreasonableness grounds.  Instead, Sabal advances several contract-based theories to argue that the SACA's forum selection clause is inapplicable.  Since such arguments call for the interpretation of the

---

[7] In such a case, a court applies a four factor test considering whether:

(1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

Haynesworth, 121 F.3d at 963.

dueling contracts, New York law controls.[8]  See Weber, 811 F.3d at 770 ("[T]he question of enforceability is analytically distinct from the issue of interpretation.")

        1.     The Merger Clause and Parol Evidence

Sabal's principle argument is that the merger clause in the Master Swap Agreement voids the SACA or its forum selection clause.  In the alternative, Sabal argues that the merger clause prohibits consideration of the SACA's forum selection clause pursuant to the parol evidence rule.

"The purpose of a merger clause is to require the full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing."  Jarecki v. ShungMoo Louie, 745 N.E.2d 1006, 1009 (N.Y. 2001).  "Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing."  Marine Midland Bank-Southern v. Thurlow, 425 N.E.2d 805, 807 (N.Y. 1981).  However, "the power of a merger clause does not extend to antecedent contracts or events which are beyond the scope of the contract encompassing the clause."  OneBeacon Amer. Ins. Co. v. Comsec Ventures Intern., Inc., No. 8:07-cv-900, 2010 WL 114819, at *5 (N.D.N.Y Jan. 7,

---

[8] Recently, the Fifth Circuit declined to determine whether a court should apply federal or state law to determine the "validity" of a contract's forum-selection clause.  Barnett, 2016 WL 4010440 at 5.

2010) (citing Primex Int'l Corp. v. Wal-Mart Stores, Inc., 89 N.E. 2d 624, 627

(N.Y. 1997)).

        The merger clause states that the Master Swap Agreement "constitutes

the entire agreement and understanding of the parties with respect to its subject

matter and supersedes all oral communication and prior writings with respect

thereto." (Master Swap Agreement § 9(a).)  The "subject matter" of the Master

Swap Agreement is the swap itself.  In contrast, the SACA pertains to the rights

and obligations of Sabal and Deutsche Bank concerning the creation and control

over Sabal's Securities Accounts located at DBSI.  Since the two agreements

pertain to different subject-matter, the parol evidence rule is inapplicable.  In this

instance, parol evidence would include prior or contemporaneous oral or written

agreements between Sabal and Deutsche Bank relating to the swap itself.  Yet here,

the forum selection clause in the SACA does not alter, vary, or contradict the

forum selection clause in the Master Swap Agreement because the two clauses

apply to disputes involving separate subject-matters.  In the former instance, the

SACA's forum selection clause applies to disputes arising out of or relating to the

SACA and the Securities Accounts it established.  In the latter instance, the Master

Swap Agreement's forum selection clause applies to disputes relating to the swap.

Additionally, the parties to the SACA are Sabal, Deutsche Bank, and DBSI, while

the parties to the Master Swap Agreement are Sabal and Deutsche Bank.  In such

case where one party to the SACA is not a party to the Master Swap Agreement, the parol evidence rule is not applicable.  Marinelli v. Unisa Holdings, Inc., 655 N.Y.S.2d 495, 496 (App. Div. 1997) ("[T]he parol evidence rule is not applicable since the alleged oral promise was made by one not a party to the written agreement.").  Accordingly, the Court finds that "it is readily demonstrable that enforcement of the parties' obligations . . . arising out of [the SACA] does not implicate the parol evidence rule in connection with the [Master Swap Agreement] and, hence, is not precluded by the merger clause in that [latter] writing."  Primex, 89 N.E. 2d at 627.

       Further, the Court finds that the merger clause in the Master Swap Agreement does not void or supersede the SACA.  Under New York law, the general language of a merger clause like that included in the Master Swap Agreement, "is insufficient to establish any intent of the parties to revoke retroactively their contractual obligations."  Gen. Motors Corp. v. Fiat S.p.A, 678 F. Supp. 2d 141, 148 (S.D.N.Y. 2009) (quoting Primex, 89 N.E. 2d at 627).  Here, the merger clause in the Master Swap Agreement is general in nature, and does not exhibit language demonstrating any intent between Sabal and Deutsche Bank to revoke or novate the SACA.  Indeed, the Master Swap Agreement expressly provides that "the rights, powers, remedies and privileges in this Agreement are *cumulative*."  (Master Swap Agreement § 9(d).) (emphasis added).  See Bank

Julius Baer & Co., Ltd. v. Waxfield Ltd., 424 F.3d 278, 283 (2d Cir. 2005),

abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters, 561

U.S. 287 (2010) (explaining that a merger clause in a subsequent contract did not

void a previous contract because the subsequent agreement stated it was

cumulative).  Finally, "a contract should not be interpreted to produce a result that

is absurd," and to read the merger clause as a revocation of the SACA would lead

to an absurd result.  Greenwich Capital Fin. Prods., Inc. v. Negrin, 903 N.Y.S.2d

346, 348 (N.Y. App. Div. 2010).  Here, the Swap Documents require eligible

collateral, and presumably all quarterly payments, to use the Securities Accounts

established by the SACA.  (See CSA § 13(g)(i); id. Ex. A.)  To find that the merger

clause voids the SACA, would essentially void the very accounts used to deposit

the quarterly transfers and hold collateral for the swap.

    Accordingly, since the SACA is an antecedent contract, and both

agreements focus on different subject-matter, the Master Swap Agreement's

merger clause neither voids the SACA nor prevents its consideration in this lawsuit

pursuant to the parol evidence rule.  See Regions Bank v. Baldwin Cnty Sewer

Service, LLC, 106 So.3d 383 (Ala. 2012) (holding that under New York law, the

merger clause in an ISDA agreement identical to the one in this case had no effect

on a prior contract between the parties).

2.   <u>Sabal's Other Arguments</u>

Sabal also contends that the Master Swap Agreement controls over the SACA because it was entered into later in time.  (Dkt. # 13 at 15.)  Sabal correctly points out that in New York "[i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract."  <u>Barnum v. Millbrook Care LP</u>, 850 F. Supp. 1227, 1236 (S.D.N.Y. 1994) (citing <u>Coll. Auxiliary Servs. of State Univ. College, Inc. v. Slater Corp.</u>, 456 N.Y.S. 512 (N.Y. App. Div. 1982)).  However, Sabal's argument fails because the SACA and the Master Swap Agreement do not regard the same subject-matter.  As previously mentioned, the SACA controls Sabal's, Deutsche Bank's, and DBSI's obligations and rights of control over the Securities Accounts, and the Master Swap Agreement pertains to the swap transaction.  Accordingly, the Master Swap Agreement, although later in time, did not supersede the SACA because they relate to separate subjects.

Sabal next argues that the Master Swap Agreement controls because it is specific to the matters in dispute.  (Dkt. # 13 at 16.)  Under New York law, "[w]here two documents are to be construed—one specifically prepared for the transaction in question and the other a general form—the former takes precedence as to all provisions [that] are repugnant in the two documents."  <u>Oakgrove Const., Inc. v. Genesee Valley Nurseries, Inc.</u>, 834 N.Y.S.2d 822, 823 (N.Y. App. Div. 2007).  The Court agrees with Sabal that its breach of contract claims in this

lawsuit address the swap transaction, and that the Master Swap Agreement is

specific to that issue.  However, the Court disagrees with Sabal that the only issue

present in this lawsuit references the swap.  Sabal specifically seeks, inter alia, a

declaratory order from the Court that "[Deutsche Bank] . . . must release that

collateral" stored in the Securities Accounts held by DBSI.  (Am. Compl. ¶ 42(c).)

Sabal needs a court order to cause Deutsche Bank to release collateral from the

Securities Account because under the terms of the SACA, DBSI may not honor

any request from Sabal to "redeem or transfer" money held in the collateral

account.  (SACA § 2.4.2.)  Instead, "[i]n the event that [DBSI] receives an [order]

from [Deutsche Bank] that is inconsistent with any order and/or instructions

received from [Sabal], [DBSI] shall honor [the instruction] of [Deutsche Bank]."

(Id. § 2.4.3.)  Since Sabal has affirmatively pled declaratory relief to override the

provisions of the SACA, it has directly implicated that agreement.  Therefore, the

Court finds that there are two specific transactions at issue here—one relating to

the swap and one relating to control over the Securities Accounts—and that the

Oakgrove rule is inapplicable.

                Finally, the first-to-file rule does not otherwise require this lawsuit to

remain in this Court.  "The first-to-file rule is a discretionary doctrine."  Cadle Co.

v. Whataburger of Alice, Inc., 174 F.3d 599, 603 (5th Cir. 1999). "Under the first-

to-file rule, when related cases are pending before two federal courts, the court in

25

which the case was last filed may refuse to hear it if the issues raised by the cases substantively overlap." In re Spillman Development Grp., Ltd., 710 F.3d 299, 307 (5th Cir. 2013) (quoting Cadle Co., 174 F.3d at 603). Sabal's first-to-file argument misses the mark for one significant reason—the rule enables a court retaining jurisdiction over a later filed case to refuse to hear it because of an already pending case. Since this Court has jurisdiction over the originally filed lawsuit, the rule is inapplicable. Therefore, the first-to-file rule is an argument more appropriately made before the Southern District of New York, which is venue to the NY Action where Deutsche Bank and DBSI have sued Sabal over the swap.

Accordingly, the Court finds that the SACA is not a voided instrument under principles of New York contract law, and may be applicable to this lawsuit if the issues presented fall within the scope of its forum selection clause.

D. Scope of the Forum Selection Clauses at Issue

Fifth Circuit and New York law apply similar standards to determine whether the scope of a forum selection clause reaches the instant dispute. To determine whether the forum-selection clause applies to the type of claims asserted in the lawsuit, courts "look to the language of the parties' contract to determine which causes of action are governed by the forum selection clause . . . ." Marinechance Shipping, Ltd. v. Sebastian, 143 F.3d 216, 222 (5th Cir. 1998). "If the substance of the plaintiff's claims, stripped of their labels, does not fall within

26

the scope of the forum selection clause, the clause cannot apply." Id.  In New York, "[t]he applicability of a forum selection clause does not depend on the nature of the underlying action."  Couvertier v. Concourse Rehabilitation and Nursing, Inc., 985 N.Y.S. 683, 684 (N.Y. App. Div. 2014).  Instead, "it is the language of the forum selection clause itself that determines which claims fall within its scope." Id.

The New York trend is that broadly worded forum selection clauses encompass a wide variety of claims.  For example, the Appellate Division–Third Department found a mandatory forum selection clause encompassed *third-party* claims where the clause extended to "any dispute arising under or in connection with" the agreement.  Couvertier, 985 N.Y.S. at 684.  That same court found that tort claims were encompassed by a forum selection clause because its scope extended to disputes "relating to the Contract."  Id.; Walker, Truesdell, Roth & Assocs., Inc. v. Globeop Financial Servs. LLC, 993 N.Y.S.2d 647 (N.Y. Sup. Ct. 2013).

The SACA's forum selection clause states:

> In any action or proceeding arising out of or relating to this Agreement, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the courts of the States of New York and the federal courts in New York City.

(SACA § 4.2.)  In this case, the SACA is a broadly worded forum selection clause that will encompass a wide variety of claims and remedies.  Sabal has pled a cause

of action for conversion of its money held in the collateral Securities Account, and seeks a remedy of declaratory relief, both of which, despite artful pleading, are clearly "related to" the SACA. The SACA provides that Deutsche Bank has exclusive authority over collateral held in the Securities Account maintained at DBSI. The authority is so exclusive that the SACA grants Sabal no authority to transfer its money held in that account. Here, Sabal alleges that Deutsche Bank has "locked" its collateral Securities Account at DBSI and unlawfully holds collateral in that account. Since the declaratory relief sought is meant to override Deutsche Bank's exclusive authority over money in the collateral Securities Account, the Court finds that this dispute "relates to" the SACA because that instrument created Deutsche Bank's authority over the account at issue.

It is irrelevant that Sabal has also asserted breach of contract claims that indisputably arise out of the Master Swap Agreement. Pleading claims that do not relate to the SACA does not immunize Sabal from the SACA's mandatory forum selection clause because Sabal has also sought relief related to the SACA. Indeed, in New York, a plaintiff "cannot circumvent application of [a] forum selection clause by pleading parallel and/or additional related noncontractual claims." Tourtellot v. Harza Architects, 866 N.Y.S.2d 793, 795 (N.Y. App. Div. 2008). The only foreseeable way Sabal could have avoided the SACA's mandatory forum selection clause would have been to assert breach of contract

28

claims for the Master Swap Agreement and nothing more.  Further, the Master Swap Agreement's forum selection clause does not unconditionally grant Sabal authority to bring a lawsuit in any venue it chooses.  Instead, the language states only that "[n]othing in <u>this</u> Agreement precludes [Sabal] from bringing Proceedings in any other jurisdiction."  (Master Swap Agreement § 13(b).) (emphasis added).  While nothing in the Master Swap Agreement prevents Sabal from bringing a lawsuit in a non-New York jurisdiction, a different agreement, the SACA, requires Sabal to bring lawsuits relating to it in a New York venue.

For the reasons explained above, the Court finds that the SACA contains a mandatory forum selection clause requiring disputes related to it be brought in New York State courts or the federal courts in New York City.  The Court also finds that the scope of the SACA extends to certain claims and remedies of relief that Sabal has affirmatively pled.  Accordingly, this dispute "relates to" the SACA.  <u>See</u> <u>Rubens v. UBS AG</u>, 5 N.Y.S.3d 55 (N.Y. App. Div. 2015) (enforcing a mandatory forum selection clause in an account opening document like the SACA).

II.   <u>Whether to Transfer Venue</u>

If a contractually valid forum-selection clause exists and applies to the lawsuit, a court should grant the motion to transfer in accordance with the forum-selection clause absent extraordinary circumstances.  <u>Atlantic Marine</u>, 134 S. Ct at

581.  Here, Sabal has failed to meet its "heavy burden" of establishing that transfer would be unwarranted due to extraordinary circumstances.  Id. at 582−83.  Indeed, none of the public factors suggest the existence of extraordinary circumstances.  Both the federal courts of the Western District of Texas and the Southern District of New York have enormous civil case loads.  Indeed, actions per judgeship in the Western District of Texas exceed those of the Southern District of New York by a ratio of nearly two-to-one.[9]  Thus, the administrative difficulties flowing from court congestion counsel in favor of transfer.

Second, the local interest in having localized interests decided at home is not sufficient to demonstrate an extraordinary circumstance.  Even though Sabal is a San Antonio, Texas, based investment firm, there is no feature of this case or question presented that is unique to the area.  A party's residence does not necessarily establish a truly localized interest.  Instead, the issues presented in this case implicate contract interpretation involving a foreign party and New York law, Securities Accounts maintained in Houston, Texas, and a swap agreement tied to a financial index that tracks the U.S. dollar.  These are not localized interests exceptional to the San Antonio area, but are instead more global in nature.  Sufficient localized interests are more likely to involve issues exceptional, or unique, to the local venue; examples may include specific water and oil rights, or a

_____

[9] The Court takes judicial notice of statistics published on the official United States Courts website.

case involving a company that maintains a significant corporate footprint through high localized employment rates and contributions to the local economy.

Third, the familiarity of the Southern District of New York with the law that will govern the case favors transfer.  Even though "federal judges routinely apply the law of a State other than the State in which they sit," Atlantic Marine, 134 S.Ct. at 584, there is no doubt that the Southern District of New York applies New York law more frequently than this Court does.  Just as this Court is more familiar with the nuances of Texas contract law and its rules of interpretation, the Southern District of New York is more familiar with the application of New York law.

The final factor—avoiding unnecessary problems of conflict of laws or application of foreign law—is neutral.  Neither party identifies any reason that transfer would implicate problems involving conflicts of law or the application of a foreign law.

Accordingly, the Court finds that transfer of venue to the Southern District of New York is appropriate pursuant to 28 U.S.C. § 1404(a).[10]

---

[10] Deutsche Bank argues that this Court lacks personal jurisdiction over it.  The Supreme Court holds that a court may order the transfer of venue of a case involving a defendant over whom the court lacks personal jurisdiction.  Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962).

CONCLUSION

For the reasons explained, the Court **GRANTS** Deutsche Bank's

Motion to Transfer Venue and **ORDERS** the Clerk of Court to **TRANSFER** this

case to the United States District Court for the Southern District of New York.

**IT IS SO ORDERED.**

**DATE:** San Antonio, Texas, September 19, 2016.

_____

DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE

32