IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SABAL LIMITED LP, | § | No. 5:16–CV–300–DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| DEUTSCHE BANK AG, | § | |
| | § | |
| Defendant. | § | |

ORDER DENYING MOTION FOR RECONSIDERATION

Before the Court is a Motion for Reconsideration filed by Sabal Limited, LP ("Sabal" or "Plaintiff").  (Dkt. # 25.)  Pursuant to Local Rule CV-7(h), the Court finds this matter suitable for disposition without a hearing.  After careful consideration of the memoranda filed in support of and in opposition to the pending motion, the Court, for the reasons that follow, **DENIES** the Motion for Reconsideration (Dkt. # 25).

BACKGROUND

The Court extensively explained the factual background and circumstances of the present case in its September 19, 2016 Order granting a motion to transfer venue.  (Dkt. # 21.)  Since the parties are fully aware of the facts, the Court will only discuss the relevant facts necessary to dispose of the Motion for Reconsideration.

1

On February 23, 2010, Sabal, Deutsche Bank Securities Inc.[1]

("DBSI"), and Deutsche Bank AG ("Deutsche Bank")—through its New York

affiliate Deutsche Bank Trust Company of Americas—entered into a Securities

Account and Control Agreement ("SACA").  ("SACA," Dkt. # 13-10, Ex. 9.)

Through the SACA, Sabal established two accounts at DBSI: a primary account

"used for trading and margin activities," and a secondary account "used solely to

hold financial assets as collateral" in favor of Deutsche Bank (collectively, "the

Securities Accounts").  (Id. § 2.2.1.)  The SACA required DBSI to honor all

instructions from Sabal with respect to financial assets held in the primary account.

(Id. ¶ 2.4.1.)  However, the SACA prohibited DBSI from honoring Sabal's requests

to trade, redeem, or transfer financial assets in the secondary account, and granted

Deutsche Bank a first lien on the secondary account.  (Id. §§ 2.2.2, 2.4.2.)  The

SACA contained a mandatory forum-selection clause requiring "any action or

proceeding by Sabal against [Deutsche Bank] in any respect to any matter arising

out of, or in any way relating to, this Agreement or the obligations of [Sabal]

hereunder shall be brought only in the State and County of New York."  (Id. § 4.2.)

The SACA also contained a clause stating that "[i]n the event of any conflict

between this Agreement (or any portion thereof) and any other agreement now

---

[1] DBSI is a Deutsche Bank affiliate and a broker-dealer that executes securities
transactions for Deutsche Bank and its clients.  (Dkt. # 9 at 2.)

existing or hereafter entered into, the terms of this Agreement shall prevail." (Id. § 5.1.)

On July 15, 2011, approximately seventeen months after opening the securities accounts, Sabal and Deutsche Bank entered into a swap agreement, the details of which are explained in the Court's September 19, 2016 Order. (Dkt. # 21.) Sabal and Deutsche Bank memorialized the swap agreement using four separate, industry standard, and integrated instruments. The four instruments are: (1) the International Swap Dealers Association ("ISDA") Master Agreement ("Master Swap Agreement"); (2) the Schedule to the ISDA Master Swap Agreement ("Swap Schedule"); (3) the Credit Support Annex to the Swap Schedule ("CSA"); and (4) the trade confirmation ("Confirmation") (collectively "Swap Documents"). ("Master Swap Agreement," Dkt. # 13-6, Ex. 5; "Swap Schedule," Dkt. # 13-7, Ex. 6; "CSA," Dkt. # 13-8, Ex. 7; Confirmation.)

The Master Swap Agreement contains a permissive forum-selection clause whereby the parties consented to the non-exclusive jurisdiction of New York courts and the United States District Court for Southern District of New York. (Master Swap Agreement § 13(b)(i).) While the parties consented to the non-exclusive jurisdiction in New York, the permissive forum-selection clause did not "preclude[] either party from bringing [p]roceedings in any other jurisdiction." (Id. § 13(b).) The CSA set forth provisions on how collateral would be handled

3

during the swap.  First, swap collateral would be held in the collateral account established by the SACA.  (CSA § 13(g)(i).)  Second, Sabal "irrevocably" authorized Deutsche Bank and DBSI to disregard any instruction from Sabal relating to the collateral account that would violate certain conditions precedent necessary for Sabal to close or withdraw funds from the collateral account.  (Id. § 13(g)(iv).) Third, Sabal "irrevocably" authorized Deutsche Bank to originate entitlement orders with respect to the collateral account at DBSI without needing Sabal's consent.  (Id.)  Finally, the Master Swap Agreement contained a merger clause stating that it "constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto."  (Master Swap Agreement § 9(a).)

Eventually a dispute arose between the parties relating to quarterly payments pursuant to the terms of the swap and money in the collateral account allegedly posted as collateral for the swap.

On March 24, 2016, Sabal filed suit in this Court.  (Dkt. # 1.)  On March 30, 2016, Sabal filed an Amended Complaint.  ("Am. Compl.," Dkt. # 3) Sabal seeks declaratory judgment, asserts a cause of action for conversion, and two causes of action for breach of contract.  (Id. ¶¶ 40−54.)  On May 5, 2016, Deutsche Bank and DBSI sued Sabal in the United States District Court for the Southern District of New York ("the NY Action") for conduct arising out of the same facts

4

of this case. (Dkt. # 13-5, Ex. 4.) On September 19, 2016, this Court issued an

order granting Deutsche Bank's Motion to Transfer Venue. (Dkt. # 21.) On

September 28, 2016, Sabal filed the instant Motion for Reconsideration. (Dkt.

# 25.) Deutsche Bank filed a Response (Dkt. # 29), and Sabal filed its Reply (Dkt.

# 30).

## LEGAL STANDARD

"A motion asking the court to reconsider a prior ruling is

evaluated . . . as a motion . . . under Rule 59(e) . . . [when] filed within twenty-

eight days after the entry of judgment." Demahy v. Schwarz Pharma, Inc., 702

F.3d 177, 182  n.2 (5th Cir. 2012).   "A Rule 59(e) motion calls into question the

correctness of a judgment."  Templet v. Hydrochem, Inc., 367 F.3d 473, 478 (5th

Cir. 2004).  "A motion to alter or amend the judgment under Rule 59(e) 'must

clearly establish either a manifest error of law or fact or must present newly

discovered evidence' and 'cannot be used to raise arguments which could, and

should, have been made before the judgment issued.'"  Schiller v. Physicians Res.

Grp. Inc., 342 F.3d 563, 567 (5th Cir. 2003) (quoting Rosenzweig v. Azurix Corp.,

332 F.3d 854, 863−64 (5th Cir. 2003)).  "Under Rule 59(e), amending a judgment

is appropriate (1) where there has been an intervening change in the controlling

law; (2) where the movant presents newly discovered evidence that was previously

unavailable; or (3) to correct a manifest error of law or fact."  Demahy, 702 F.3d at

5

182.  Rule 59(e), however, is "not the proper vehicle for rehashing evidence, legal

theories, or arguments that could have been offered or raised before entry of

judgment," but instead is intended to allow a court to correct manifest errors or law

or fact, to correct inadvertent clerical errors, or to present newly discovered

evidence.  Templet, 367 F.3d at 478.  A "[m]anifest error is one that is 'plain and

indisputable, and that amounts to complete disregard of controlling law.'"  Guy v.

Crown Equip. Corp., 394 F.3d 320, 325 (5th Cir. 2004) (citation omitted).

"Reconsideration of a judgment [or order] is an extraordinary remedy that should

be used sparingly."  Templet, 367 F.3d at 479.

DISCUSSION

   The basic principle of Sabal's argument is that the parol evidence rule

precludes consideration of the SACA, and that therefore the SACA's mandatory

forum-selection clause is inapplicable.

   "[W]here a contract contains a merger clause, a court is obliged to

'require full application of the parol evidence rule in order to bar the introduction

of extrinsic evidence to vary or contradict the terms of the writing.'"  Schron v.

Troutman Sanders LLP, 986 N.E.2d 430, 433−34 (N.Y. 2013) (quoting Matter of

Primex Int'l Corp. v. Wal−Mart Stores, 679 N.E.2d 624, 627 (N.Y. 1997)).

"Parole evidence—evidence outside the four corners of the document—is

admissible only if a court finds an ambiguity in the contract.  As a general rule,

6

extrinsic evidence is inadmissible to alter or add a provision to a written

agreement." Id. at 433.  However, "the power of a merger clause does not extend

to antecedent contracts or events which are beyond the scope of the contract

encompassing the clause." OneBeacon Amer. Ins. Co. v. Comsec Ventures Int'l,

Inc., No. 8:07-cv-900, 2010 WL 114819, at *5 (N.D.N.Y Jan. 7, 2010) (citing

Primex, 89 N.E. 2d at 627).  Accordingly, an antecedent contract that relates to

different subject matter is not excluded as parol evidence.

      In the September 19, 2016 Order granting the motion to transfer

venue, the Court found the parol evidence rule inapplicable because the SACA and

Master Swap Agreement pertain to different subject matters.  (Dkt. # 21 at 21.)

Specifically, the Court reasoned:

> The merger clause states that the Master Swap Agreement "constitutes
> the entire agreement and understanding of the parties with respect to
> its subject matter and supersedes all oral communication and prior
> writings with respect thereto." (Master Swap Agreement § 9(a).)  The
> "subject matter" of the Master Swap Agreement is the swap itself.  In
> contrast, the SACA pertains to the rights and obligations of Sabal and
> Deutsche Bank concerning the creation and control over Sabal's
> Securities Accounts located at DBSI.  Since the two agreements
> pertain to different subject-matter, the parol evidence rule is
> inapplicable.  In this instance, parol evidence would include prior or
> contemporaneous oral or written agreements between Sabal and
> Deutsche Bank relating to the swap itself.  Yet here, the forum
> selection clause in the SACA does not alter, vary, or contradict the
> forum selection clause in the Master Swap Agreement because the
> two clauses apply to disputes involving separate subject-matters.  In
> the former instance, the SACA's forum selection clause applies to
> disputes arising out of or relating to the SACA and the Securities
> Accounts it established.  In the latter instance, the Master Swap

Agreement's forum selection clause applies to disputes relating to the swap.

(Id.)  Accordingly, the Court found that the SACA was an antecedent contract focused on different subject matters, resulting in the irrelevance of the parol evidence rule.  See Regions Bank v. Baldwin Cty. Sewer Service, LLC, 106 So.3d 383 (Ala. 2012) (holding that under New York law, the merger clause in an ISDA agreement identical to the one in this case had no effect on a prior contract between the parties).  Premised from this legal conclusion, the Court found that the SACA's mandatory forum-selection clause required transfer of venue to New York because the dispute was "related to" the SACA.

In the instant Motion, Sabal argues that the Court's holding on the inapplicability of parol evidence is a manifest error of fact and law.  (Dkt. # 25 at 2.)  Specifically, Sabal argues that the CSA of the swap documents "contains specific instructions in ¶ 13(g)(iv) for handling the collateral in the context of the swap.  In other words, for proposes of the swap, the rules for handling the collateral in Sabal's account with DBSI are expressly set forth in the swap documents."  (Id.)  As a result, Sabal argues, "the handling of the swap collateral in Sabal's account with DBSI is indeed part of the subject matter of the swap."  (Id. at 3.)  "Thus, in the context of this swap transaction the subject matter of the SACA is precisely within the subject matter of the swap documents—and thus is subject

8

to the parol evidence rule's prohibition on going outside the four corners of the

relevant contract to ascertain the terms of the parties' deal."  (Id.)

        The Court disagrees because ¶ 13(g)(iv) is not as sweeping as Sabal

suggests.  Paragraph 13(g)(iv) of the CSA states in whole:

> ***Eligible Accounts.***[2] [Sabal] may close, or withdraw funds or property
> from, and Eligible Account provided as Eligible Collateral *only if* (ii)
> such close or withdrawal is part of a substitution effected in
> accordance with Paragraph 4(d)[3] of this Annex or (ii) after giving
> effect to such close or withdrawal, the value of the remaining Posted
> Collateral for purposes of this Annex will be equal to or greater than
> that required hereunder.

> [Sabal] hereby irrevocably authorizes [Deutsche Bank] and [DBSI] to
> disregard any instruction from [Sabal] relating to an Eligible Account
> established with such entity *which violates the provisions of this
> Paragraph 13(g)(iv).*

> [Sabal] hereby irrevocably authorizes [Deutsche Bank] to originate
> entitlement orders[4] (within the meaning of Article 8 of the New York
> Uniform Commercial Code) with respect to each Eligible Account
> maintained with [DBSI], and [DBSI] agrees that (x) it will comply
> with such entitlement orders originated by [Deutsche Bank] without
> further consent by [Sabal] and (y) it is acting as agent for [Deutsche
> Bank] with respect to such Eligible Account.

---

[2] Pursuant to the terms of the swap, the "eligible accounts" are the very accounts
created by the SACA.  (Dkt. # 13-8, Ex. A.)

[3] Paragraph 4(d) permits Sabal, in certain circumstances, to exchange or substitute
its collateral.  (CSA ¶ 4(d).)

[4] Under New York law, an entitlement order means "a notification communicated
to a securities intermediary directing transfer or redemption of a financial asset to
which the entitlement holder has a security entitlement."  N.Y. U.C.C. § 8-102(8).

(CSA ¶ 13(g)(iv) (emphasis added).)  The express language of this paragraph binds the parties to three covenants.  The first section of the paragraph permits Sabal to close or withdraw swap funds from the collateral account so long as two conditions are met: either the withdrawal is done as a substitution of collateral or the withdrawal does not reduce the value of the account below that required by the swap.  The third section of the paragraph permits Deutsche Bank to originate entitlement orders for the swap without Sabal's interference.  The second section of the paragraph authorizes Deutsche Bank and DBSI to disregard any instruction from Sabal, but only to the extent that such an instruction would violate "*the provisions of this Paragraph 13(g)(iv)*."  Stated differently, CSA ¶ 13(g)(iv) only allows Deutsche Bank and DBSI to ignore Sabal's instructions if Sabal attempts to close or withdraw swap funds if either of two conditions are not met, and to ignore Sabal's instructions relating to origination of entitlement orders.  Otherwise, Paragraph 13(g)(iv) of the CSA reaches no other obligation between Sabal and Deutsche Bank.  In contrast, the SACA contains broad and powerful language restricting Sabal's power over the secondary (collateral) account.  Specifically, DBSI may not honor any request from Sabal to "redeem or transfer" money held in the collateral account.  (SACA § 2.4.2.)

Accordingly, the SACA and the swap documents do not relate to the exact same subjects, especially with respect to the division of authority over the

collateral account maintained at DBSI.  Indeed, Sabal is not seeking to complete a collateral substitution, nor has it alleged that any withdrawal of funds would not deplete the account of money sufficient to meet its collateral obligations pursuant to the swap.  Sabal is wrong to suggest that Paragraph 13(g)(iv) of the CSA "contains specific instructions . . . for handling the collateral in the context of the swap."  (DKt. # 25 at 2.)  Instead, Paragraph 13(g)(iv) has limited application for control over the relevant securities account with respect to the swap.  As noted above, the CSA simply permits Sabal to close or withdraw swap funds from the collateral account where conditions precedent are met, prohibits Sabal from interfering with entitlement orders, and authorizes Deutsche Bank to ignore Sabal's instructions that violate the former two clauses.  Meanwhile, the SACA requires DBSI to "not honor *any instructions* from [Sabal] with respect to (i) orders from the [Sabal] to *redeem or transfer financial assets* in the [collateral] account or . . . to trade financial assets in the [collateral] account."  (SACA § 2.4.2.)

Further, in Sabal's Amended Complaint, it seeks a declaratory order from the Court that "[Deutsche Bank] . . . must release that collateral" stored in the Securities Accounts held by DBSI."  (Am. Compl. ¶ 42(c).)  Sabal's request for declaratory relief does not implicate the CSA's Paragraph 13(g)(iv) because Sabal does not seek an order compelling Deutsche Bank to let Sabal close or withdraw funds from the collateral account *where conditions precedent are met*, as required

11

by Paragraph 13(g)(iv).  Nor does Sabal seek a declaratory order affecting an

origination of an entitlement order.  Since Sabal does not implicate the authorities

outlined in Paragraph 13(g)(iv) of the CSA, the only reasonable conclusion is that

Sabal seeks a Court order to override the SACA's provision permitting DBSI to

not honor any instructions from Sabal to redeem or transfer funds in the collateral

account.  Accordingly, the Court confirms its original holding; the parol evidence

rule is inapplicable because the two agreements pertain to different subject matters

and two specific, yet separate transactions.

CONCLUSION

For the reasons explained, the Court **DENIES** the Motion for

Reconsideration.  (Dkt. # 25.)

**IT IS SO ORDERED.**

**DATE:** San Antonio, Texas, November 1, 2016.

_____
DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE